David N. GEISE, F. Foster Furman, Frandlin G. Furman, Joel R. Furman, William Furman, Jr., Don A. Geise, James F. Kohl, Kent J. Kohl, Kermit K. Kohl, David Furman, Daniel Severn, Sharon Wagner, and Darlene Davidson, Trading as Furman Enterprises, Appellees

v.

NATIONWIDE LIFE AND ANNUITY COMPANY OF AMERICA; Provident Mutual Life and Annuity Company, Nationwide Life Insurance Company of America, Provident Mutual Life Insurance Company, And Provident Mutual Life Insurance Company of Philadelphia, Appellants.

Superior Court of Pennsylvania.

Argued Oct. 23, 2007.

Filed Dec. 18, 2007.

Stephen Gray, Columbus, OH, for appellant.

Donald B. Kaufman, Harrisburg, for appellee.

BEFORE: STEVENS, BENDER and McCAFFERY, JJ.

OPINION BY BENDER, J.:

¶ 1 Nationwide Life and Annuity Company of America, previously known as Provident Mutual Life Insurance Company (hereinafter "Provident," "Nationwide," or "Provident/Nationwide"), the defendants in this underlying action, appeal from the judgment entered in favor of the plaintiffs, Furman Enterprises ("Furman") and its individual partners, following a jury trial in this breach of contract action to recover benefits on a life insurance policy owned by Furman on one of its partners, K. James Kohl. We affirm.

¶ 2 On May 14, 1988, Furman, a partnership consisting of family members who own stock in Furman Foods, Inc. (a company involved in the business of processing vegetables under the Furmano label), purchased a life insurance policy, with a whole life component, from Provident Mutual Life Insurance Company on the life of Mr. Kohl, a family member who served as the corporate secretary and farm manager for Furman Foods. N.T. Trial Vol. I, 8/15/06 ("N.T.Vol.I"), at 49–51, 64. Furman purchased the policy in order to fund its contractual obligation to Mr. Kohl's estate to purchase, upon the death of Mr. Kohl, the stock owned by Mr. Kohl in Furman Farms, the parent company of Furman Foods, and Mr. Kohl's partnership interest in Furman Enterprises. *Id.* at 52, 63–64.

¶ 3 From 1988 through 1995, Furman paid Provident the annual premiums for the policy, due on May 14th of each year. *Id.* at 45. Around mid-April of each year, Provident would send Furman a notice of premium due, which included a "portion or segment which was to be detached from the notice and returned to Provident with a premium payment." *Id.* at 46; N.T. Trial Vol. III, 8/16/06 ("N.T.Vol.III"), at 16. "From 1996 through 2000, the annual premiums on the policy were paid using internal policy cash reserves." N.T. Vol. I at 46. Even so, prior to May 14th in each of the years where the premium was paid by internal policy cash reserves, Provident still "sent to Furman a document setting forth the premium for the year, the reduction in dividends and the surrender of inside additions applied to pay that premium and showing an amount due of zero dollars." *Id.* at 46. *See also* Exh. 2 (Provident premium notice from 1998 on Kohl policy showing premium amount for 12 month period, amount of dividend applied to reduction of premium, amount of surrendered inside additions applied to premium, and indicating "amount due" from insured as zero). In 2000, the internal policy cash reserves were still adequate to cover the cost of the premium, despite the increase in the premium by that time. N.T. Trial Vol. II, 8/15/06 ("N.T.Vol.II"), at 15.[1]

¶ 4 By the time the next premium payment was due, *i.e.*, May 14, 2001, the internal policy cash reserves were inadequate to cover the cost of the premium, thereby requiring Furman to pay the premium out-of-pocket. However, Furman contended that it had not received any premium notice for any premium that was due by May 14, 2001. N.T. Vol. I at 55, 74, 103. Moreover, Furman indicated that it did not receive any late payment offer or second notice that the premium was due on May 14, 2001, which Provident contended it had mailed, *in accordance with its ordinary course of business*, in June of 2001. *Id.* at 55, 103; N.T. Vol. III at 53. Thus, by that point, the premium remained unpaid. But Furman's position throughout this litigation was that it was not aware that any out-of-pocket premium payment was due, given Provident's lack of notice.

¶ 5 Next, "Furman received from Provident a document entitled ['N]onforfeiture [B]enefits['] dated August 14, 2001" sometimes referred to at trial as the policy cancellation notice or letter. N.T. Vol. I at 46.[2] Paul Dubendorf, Furman's chief financial officer, testified that receipt of this notice is what alerted him to the fact that the premium on the Kohl policy was unpaid. N.T. Vol. II at 16. He checked various records maintained by Furman to see if the company had received the premium notice earlier in the year. *Id.* These records included the general correspondence file with Provident, the unpaid invoices file, and the accounts payable system. *Id.* He did not find any premium notice in these records. *Id.* Thus, he con-

---

1. The annual premium on the policy from 1988 through 1998 was $23,154.70, but in 1999 and 2000, the annual premium increased to $43,450.77. N.T. Vol. I at 46. "As of May 14, 2000 the total of premium payments received by Provident since the inception of the policy was $341,603.24." *Id.* at 46.

2. Under the Kohl policy, because the premium remained unpaid following the late pay-

ment offer, the nonforfeiture option of the policy was triggered. N.T. Vol. III at 41. The nonforfeiture option provided for extended term insurance, equating to a cash value of approximately $26,000. *Id.* The cancellation notice indicated that the policy would expire on September 29, 2001. *Id.* at 42. After that date, in the absence of a premium payment, the policy expired without value. *Id.*

cluded that Furman did not receive the 2001 premium notice prior to receiving the cancellation letter. *Id.* He also ·did not find evidence of receipt of a late payment notice, which would have been sent after the premium notice to provide the company a second chance to pay the 2001 premium prior to cancellation of the policy. *Id.* at 17. Mr. Dubendorf stated that if he had received such notice he would have "absolutely" paid the premium at that time. *Id.* Mr. Dubendorf also testified that he was unaware, in the spring of 2001, that the internal policy cash value would be inadequate to cover the cost of the premium that year. *Id.* at 66.

¶ 6 Mr. Dubendorf discussed the issue with David Geise, president and CEO of Furman Foods. *Id.* at 18. Similarly, Mr. Geise also understood that, according to the cancellation letter, the policy for Mr. Kohl would expire on September 29, 2001, for nonpayment of premium. N.T. Vol. I at 55. Mr. Dubendorf and Mr. Geise decided that they needed to contact Provident immediately. N.T. Vol. II at 18. They requested that Provident reinstate the policy. N.T. Vol. I at 56, 77. Specifically, Mr. Dubendorf called Provident's customer service center, expressed his shock upon receiving the cancellation letter, explained that the company did not receive any premium notices for that year, and asked how to reinstate the policy. N.T. Vol. II at 18.

¶ 7 In response, on September 4, 2001, Furman received from Provident forms to reinstate the policy and correspondence indicating that Provident would require payment of $18,979.77 for the annual premium in order to effectuate reinstatement of the policy through May 14, 2002. N.T. Vol. I at 46. The reinstatement application sent by Provident also contained questions pertaining to Mr. Kohl's health status. N.T. Trial, Exhibit 58. In one

question, Mr. Kohl, who was eighty years old at the time, marked both "yes" and "no" to the question about whether he had consulted a physician or practitioner in the previous three years. *Id.;* N.T. Vol. I at 81. However, in a subsequent question, asking for details about all "yes" answers, Mr. Kohl indicated "N/A" for "not applicable," and he provided no detailed information in that section. N.T. Trial, Exhibit 58.

¶ 8 Although Mr. Kohl filled-out the form, Mr. Geise signed the form on behalf of the partnership. N.T. Vol. I at 79. Mr. Geise testified that he understood that the policy would not be reinstated until the application had been approved by Provident, but he "trusted that we were dealing with a reputable company [and] that we were going to have the policy reinstated." *Id.* at 79–80. In other words, he did not foresee that reinstatement of the policy would be an issue at that point. *Id.* at 80. Mr. Geise admitted that he did not review the information provided by Mr. Kohl and he did not have any discussions with Mr. Kohl at that time about the status of Mr. Kohl's health. *Id.* at 81–82.

¶ 9 On September 19, 2001, Furman mailed to Provident the reinstatement application and a check in the amount of $18,979.77, which Provident accepted and deposited. N.T. Vol. I at 46, 58. Mr. Geise thought that this payment would keep the policy in force until the next anniversary date of May 14, 2002. *Id.* at 86.

¶ 10 In the meantime, Provident contended that its employee, Jagruti Mehta, who was responsible for handling reinstatements of lapsed policies due to nonpayment of premium, reviewed the application for reinstatement submitted by Mr. Kohl. N.T. Vol. II at 109. Ms. Mehta determined that it was not properly completed because Mr. Kohl marked both

"yes" and "no" to the question concerning whether he had recently consulted a physician. *Id.* at 110. James W. DuBois, a compliance supervisor at Provident, also reviewed the reinstatement application and noted this discrepancy. N.T. Vol. III at 46. Accordingly, Ms. Mehta wrote a letter, dated November 20, 2001, to Furman asking for additional information, including clarification of the question noted above and the weight of the insured. N.T. Vol. II at 110; N.T. Vol. III at 46. She also indicated in the letter that if the additional information was not received by December 14, 2001, the "file would be closed." N.T. Vol. II at 111. Although not expressly indicated in the letter, Ms. Mehta testified that this meant that the policy would not be reinstated. *Id.* Ms. Mehta testified that she did not receive a response to this letter from Furman, nor was the letter returned to her as damaged or undeliverable. *Id.* at 112. However, Furman denied receiving this letter. N.T. Vol. I at 103.

¶ 11 Ms. Mehta sent out a second letter dated December 10, 2001, which she described as "just a courtesy reminder" that Provident did not receive the information requested for reinstatement and that such information would be needed to reinstate the Kohl policy. N.T. Vol. II at 113. Similarly, Ms. Mehta did not receive any response to this letter, but it was not returned to Provident as damaged or undeliverable. *Id.* at 114. Since Ms. Mehta received no response to either letter, she "closed the file and mailed the [$18,979.77] check that [had been] sent to [Provident with the reinstatement application and] reissued it to Furman Enterprises." N.T. Vol. I at 114. However, Furman also denied receiving Ms. Mehta's second letter. *Id.* at 103.

¶ 12 In any event, the parties did agree that, at some point after December 18, 2001, Furman received a check in the amount of $18,979.77 back from Provident, with an attached notation merely indicating "application filed away" with no further explanation. *Id.* at 47, 103; N.T. Vol. II at 21. Although Mr. Dubendorf was not sure exactly what that notation meant, he "actually . . . interpreted [it] to mean that they did not require [Furman's] check for that amount to actually reinstate the policy." N.T. Vol. II at 21. However, in actuality, Provident had not reinstated the policy. N.T. Vol. I at 47.

¶ 13 It was only a few months after that, in February of 2002, that Mr. Kohl was diagnosed with cancer. N.T. Vol. I at 82. However, Mr. Dubendorf did not realize that Provident did not reinstate the Kohl policy until he received a fax from Provident on May 21, 2002, indicating that the Kohl policy was "no longer in force." [3] N.T. Vol. II at 23. He informed Mr. Geise, who testified that this was also the first time he became aware of the fact that the policy had not been reinstated. N.T. Vol. I at 49, 58, 85. Additionally, Mr. Dubendorf advised Mr. Geise that Provident had previously sent back a check in the amount of $18,979.77. *Id.* at 86. Mr. Geise became "very concerned" at that point, and Mr. Dubendorf contacted Provident, who confirmed that the Kohl policy had not been reinstated. *Id.* at 58; N.T. Vol. II at 23.

¶ 14 Provident then sent Furman correspondence dated August 13, 2002, indicating that payment of $90,612.50 would be necessary for reinstatement of the lapsed policy in addition to completion of another

---

3. More specifically, this fax originated from an auditing request sent to Provident from Furman's accountants. Provident's faxed response showed the Kohl policy and another policy on a different company employee. A handwritten notation under Kohl's name indicated that that policy was no longer in force. N.T. Vol. II at 23.

reinstatement application. N.T. Vol. I at 59; Exh. 44. Unfortunately, Mr. Kohl died shortly thereafter, on August 24, 2002. N.T. Vol. I at 47. The policy benefit at the time of Mr. Kohl's death was $556,036.19; however, the parties agreed by stipulation that if it was determined that Furman was entitled to recover the policy proceeds, the amount of those net proceeds would be $496,716.77. Stipulations of Facts for Trial, 8/15/06, at ¶ 18; N.T. Vol. I at 48.

¶ 15 Provident later "merged into Nationwide and changed its name to Nationwide Life Insurance Company of America in [October of] 2002." Trial Court Opinion (T.C.O.), 12/13/06, at 2 n. 1. *See also* N.T. Vol. II at 74; N.T. Vol. III at 7. Furman made a demand upon Provident (now Nationwide) for payment of the death benefits due to Furman under the policy. N.T. Vol. I at 47, 62. Provident/Nationwide did not pay the policy proceeds to Furman. *Id.* at 47. Furman filed a complaint with the Pennsylvania Department of Insurance. *Id.* at 82; N.T. Vol. III at 10.

¶ 16 After filing a praecipe for writ of summons to institute this action, Furman filed a complaint, sounding in breach of contract, on December 9, 2003. On December 19, 2005, Nationwide filed a motion for summary judgment, claiming that, under the mailbox rule, Furman was deemed to have received their notices "that were generated in the ordinary course of business and placed in the regular place of mailing, establishing that [Furman] received notice of premium payment due...." Motion for Summary Judgment, 12/19/05, at ¶ 1. On June 16, 2006, following oral argument, the Honorable Charles H. Saylor, who presided over this case, denied Nationwide's motion for summary judgment.

¶ 17 On August 7, 2006, Furman filed a motion *in limine* to preclude Nationwide from introducing evidence or contending that Furman, in the absence of a premium notice, should have known that some premium was due. This motion was filed in anticipation of Nationwide's assertion that, in May of 2001, prior to the policy lapsing, Furman received, in response to their audit request, a faxed "Policy Statement" which, according to Nationwide, revealed that the internal cash reserves of the policy would be inadequate to cover that year's premium payment therefore requiring an out-of-pocket premium payment. Judge Saylor entered an order on August 8, 2006, granting Furman's motion *in limine*, thereby precluding Nationwide from introducing evidence or contending that Furman, in the absence of an actual premium notice,[4] should have known that some premium was due.

¶ 18 A jury trial commenced on August 15, 2006. On August 17, 2006, the jury rendered a verdict in Furman's favor in the amount of $496,716.77. Nationwide filed a motion for post trial relief on August 30, 2006. On December 13, 2006, following oral argument, Judge Saylor denied Nationwide's post trial motions and entered judgment on the jury's verdict in favor of Furman.

¶ 19 Nationwide filed a timely notice of appeal on January 12, 2007. On January 17, 2007, Judge Saylor ordered Nationwide to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). On January 31, 2007, Nationwide filed a timely concise statement. Nationwide properly preserved the issues raised in this appeal, which it set forth as follows

---

**4.** As explained below, Judge Saylor determined that the faxed "Policy Statement" was inadequate for purposes of notice of the premium payment due and owing by Furman to keep the policy in effect until 2002.

in the "Statement of Questions Involved" portion of its brief:

■ Whether it was legal error and/or [an] abuse of discretion to exclude documentary and testimonial evidence that an insured knew, or should have known, that a premium under an insurance policy was due, when such evidence was relevant to the issues of whether the insured knew that a premium was due on a particular date, the premium amount and whether the insured's failure to pay was excused?

■ Whether it was legal error to instruct the jury that notice of a premium due must be sent to an insured in a particular format, even when the insured already knew of its premium obligation, the premium amount was certain and the insured knew the amount of premium due?

■ Whether it was legal error to instruct the jury that, under the "Mailbox Rule," an establishment's custom as to preparing and mailing letters is insufficient to invoke the presumption that letters were received, and, instead, requiring testimony as to what a witness personally saw or did with regards to preparing and mailing a particular letter in order to establish the presumption of receipt?

■ Whether it was legal error to refuse to use proposed jury instructions and jury verdict forms that accurately articulated the law on the "Mailbox Rule" and notice and instead use instructions that erroneously stated this law?

■ Whether it was legal error to deny a motion for directed verdict and a motion for summary judgment when the denial was based on erroneous application of the law on the "Mailbox Rule" and notice?

Nationwide's brief at 8.

■ ¶ 20 In its first issue, Nationwide argues that the trial court erred by denying Nationwide the opportunity to present evidence that Furman had actual knowledge of, or should have known, that a premium in the amount of $43,450.77 was due on May 14, 2001, even in the absence of a formal notice of premium payment due. Our standard of review of a trial court's decision to admit or exclude evidence is well-settled:

When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 984 (Pa.Super.2005) (citation omitted). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Pohl v. NGK Metals Corp.*, 936 A.2d 43, 49 (2007) (citation omitted).

■ ¶ 21 Specifically, Nationwide contends that the trial court erred by excluding a fax sent to Furman by Provident/Nationwide at Mr. Dubendorf's request on May 9, 2001, *i.e.*, prior to the May 14th due date. The fax is a "Policy Statement" that contained information on the Kohl policy as of March 31, 2001. The information in this Policy Statement included the policy number, the policy issue date of May 14,

1988, the dividend as of March 31, 2001, the annual premium of $43,450.77, and the remaining total policy value of $25,319.36. Based on the information provided in the faxed Policy Statement, Nationwide contended that it was clear that the remaining total policy value was insufficient to cover the amount due for the premium in 2001. *See* Nationwide's Motion for Reconsideration, 8/10/06, at ¶ 5. Citing the deposition testimony of their own witness, Mr. DuBois, Nationwide contended that "if the inside additions were insufficient to pay the total premium amount, the inside additions would not pay for *any* of the premium due and the insured was responsible

for the *entire* premium amount." *Id.* (citing Deposition of James DuBois, 7/28/04, at 71–73).[5] Based on that proposition, Nationwide contends that "there was a definite, fixed amount that Furman had to pay—either the entire $43,450.77 premium amount or nothing." *Id.* Thus, Nationwide argued that "[e]ven in the absence of the 'formal' 'Notice of Payment Due' (which Provident[/Nationwide] maintains that Furman received), Furman knew that the entire $43,450.77 was due on May 14, 2001." *Id.* Nationwide also argues that Furman should have known that internal cash reserves would someday be inadequate to cover the cost of the premium and

---

5. Nationwide also asserts that the policy itself "clearly provided if those inside paid up additions were insufficient to pay the total premium amount due, then the inside paid up additions would not pay for any of the premium due, and the insured would therefore be responsible for the entire premium amount from outside funds." Nationwide's brief at 28. In support of this proposition in their primary brief, Nationwide generally cites a portion of the policy spanning four pages and consisting of almost 40 subparts, but fails to note any specific policy clause or language that would support their proposition. In their reply brief, however, Nationwide asserts, more specifically, that Furman had an adjustable term policy and suggests that, since *no election* as to treatment of dividends was made, then the dividends would be used to purchase inside paid up additions. Reply Brief at 13. *See also* Kohl Policy at § 7.1. Then, on the very next page in their reply brief, Nationwide contends that Furman *did elect* to treat their dividends pursuant to the Supplemental Premium Reduction Option (SPRO), *see* Reply Brief at 14, which this Court has found to provide, in part, that if the "cash value of inside paid-up additions is not large enough to pay the premium due, the dividend option will be changed to inside paid-up additions."

We cannot agree with Nationwide that this policy language "clearly provides" that the whole premium would be due from the policyholder if the inside paid up additions were insufficient. Moreover, these arguments fail to address the fact that the premium could

change as it did in 1999, and, more importantly, that the annual premium amount could, and did, in fact differ from the "amount due" from Furman in any given year. Additionally, as Judge Saylor recognized, and as further explained *infra*, the amount due was customarily provided by Provident/Nationwide on an annual basis to alert Furman with regard to whether they had to pay a premium out of pocket or whether inside additions, purchased through dividends issued by the insurer, would be sufficient to cover the premium. Given these variables, Judge Saylor did not err by refusing to impute knowledge of the amount due to Furman in response to Nationwide's contention that Furman should have known that a premium would be due and the amount of that premium.

We also note, in further support of its argument that "Furman knew exactly what it was [sic] required to keep the Kohl Policy in force" in 2001, Nationwide mischaracterizes the record by arguing that "Mr. Dubendorf testified that he knew that the premium was due on the anniversary date, which was May 14, and also knew that the annual premium was $43,450.77." Nationwide's brief at 29. However, examination of the record, including all of the pages of the record cited by Nationwide, reveals that this testimony was elicited in the context of the year 2000, when the inside paid up additions were still sufficient to cover the cost of the premium. Also, in this case, Furman never contended that it did not receive notice of the premium amount due in 2000.

that, "[n]evertheless, Furman chose not to determine the date when it might have to start making premium payments on the Kohl Policy from outside funds[,]" Nationwide's brief at 29, thereby seemingly suggesting that the onus should be on the policyholder with regard to knowing when a premium is due and what amount is due. Thus, Nationwide contends that Judge Saylor should have admitted evidence, such as the Policy Statement, as it was relevant to rebut Furman's contention that it did not receive notice of its premium obligation and to establish that Furman's failure to pay the premium in a timely fashion should not be excused. *Id.* at 30.

¶ 22 We conclude initially that Judge Saylor did not abuse his discretion by refusing to admit evidence that Furman "should have known" that a premium payment would be due in May of 2001, and that Furman should have known the amount of premium that would be due at that time to maintain their coverage on the Kohl policy. In reaching his decision to exclude such evidence, Judge Saylor relied on *Kaeppel v. Mutual Life Ins. Co. of New York,* 78 F.2d 899 (3d Cir.1935), for the proposition that Provident/Nationwide was required to provide Furman with a notice of premium due before it could forfeit the policy for nonpayment of the premium, and the Policy Statement did not provide adequate notice in this regard. *See* T.C.O. at 3–4. We agree with Judge Saylor's sound reasoning.

¶ 23 In *Kaeppel,* the policyholder paid premiums annually on a life insurance policy for nine years. *Kaeppel,* 78 F.2d at 900. The policy participated in dividends distributed by the insurer and provided that these dividends could be applied toward the payment of the premium. *Id.* The policyholder claimed to have not received a policy voucher in 1931, did not pay a premium as a result, and, consequently,

the insurer claimed that the policy lapsed. *Id.* The insured died six days later, and the insurer refused to pay the policy benefits. *Id.* In addressing this situation, the Court stated:

> If the amount of the premium is uncertain, as for instance, where the insured is entitled to have dividends credited thereon, so that he is dependent upon notice for knowledge of the sum due, which notice the insurer has been accustomed to give, ... an obligation rests upon the company to give notice as a condition precedent to forfeiture or suspension, or the depriving of a member of good standing, and the failure to pay, through the fault or otherwise of those obligated to send notice, does not affect the right of the insured.

*Id.* at 901 (quoting COUCH ON INSURANCE § 667). The Court cited a number of other sources and cases from various jurisdictions that stood for similar propositions and then stated its holding as follows:

> [I]f the insured 'shares in the profits,' if he is 'entitled' to have the dividends 'applied' or 'credited' to the reduction of premium, if the dividends 'may,' not 'must,' be applied to the payment of the premium, it is necessary, in such cases, for the company to give notice to the insured of the amount of the dividends before it may forfeit the policy for the nonpayment of the premiums....
>
> The test, therefore, which requires an insurance company in a participating policy to give notice to the insured of the amount of the dividend apportioned to his policy before forfeiting it for the nonpayment of the premium, is the *existence* or *reservation* of an option in the policy giving him the right to apply the dividends toward the payment of the premium. In the policy under consideration that option was reserved to the insured, and in consequence a duty

arose on the part of the company to give notice to him. This duty it had performed every year until the last one of the term. Under these circumstances the company could not forfeit the policy for the nonpayment of the premium and defend the action on that ground. So far as the rights of the insured are concerned, it makes no difference whether or not the notice was left out of the envelope by mistake. The insured was entitled to notice so that he would know how much he would have to pay in addition to the dividend in order to satisfy the premium and keep the policy alive and this he did not receive.

*Id.* at 902–903. Moreover, the Court continued to hold as follows:

> But regardless of the right reserved to the insured in the policy itself, textwriters and decisions generally hold that when the company has regularly and customarily given notice to the insured of the amount of the dividend, it cannot forfeit the policy for the nonpayment of the premium until it has given notice to him of the amount of the dividend, or informed him that it has abandoned that custom or practice.
>
> Couch says that: 'Where he is not otherwise entitled to notice, the greater number of the decisions apparently support the proposition that an insurance company, which adopts and uniformly adheres to the custom or practice of giving notice of payments for such a length of time as leads those insured to believe notice will be given, cannot declare a forfeiture without giving notice, or without previously advising the persons who have relied upon receiving no-

tice that the custom will be or has been discontinued.' Volume 3, p. 2193.

*Id.* at 903.

¶ 24 In the instant case, there are variables, such as the amount of dividends issued by the insurer and the amount of dividends applied to inside additions, which were exclusively within the knowledge of Provident/Nationwide, thereby obligating Provident/Nationwide to provide proper notice of the premium amount due, if any, from the insured for that year. *See also* footnote 5, *supra.* But *regardless* of that obligation, the parties do not dispute the fact that Provident/Nationwide customarily sent a notice of premium due each year since the inception of the policy. As described above, in some years, the inside additions were sufficient to cover the premium and no out-of-pocket premium payment from Furman was necessary. In other years, Furman paid the premium. In either case, it was Provident/Nationwide's custom to send Furman a notice indicating the amount of premium due with a payment voucher attached. In some years the "amount due" indicated "zero" whereas in other years, the "amount due" on the notice voucher would indicate that an out-of-pocket premium had to be paid by Furman. For these two reasons (*i.e.,* (1) the fact that a premium payment would be due and owing in some years and not others, depending on the amount of inside additions, which in turn depended on the dividend apportioned to the policy, and (2) the customary practice of sending notice each year), Judge Saylor did not abuse his discretion in relying upon *Kaeppel* to conclude that Provident/Nationwide was obligated to provide notice of the amount of premium due and the date it would be due before it could forfeit the policy for nonpayment.[6]

6. Even though both factors were present in this case, we agree with the holding in *Kaeppel* that the right to notice can be predicated on either factor (*i.e.,* the nature of the policy requires notice of the premium amount due *or* the insurer customarily sends notice).

¶ 25 The Policy Statement that Nationwide sought to admit, which was essentially a snapshot of the policy values as they existed more than two months prior to the policy anniversary date, did not contain this specific information, *i.e.,* the "amount due" from the policyholder, and it was within Judge Saylor's discretion to conclude that it could not be used by Nationwide to assert that Furman was on notice that a specified amount of premium payment would be due on May 14, 2001, in order to keep the Kohl policy in effect. *See* T.C.O. at 12 (indicating that the Policy Statement did not indicate "what the actual premium amount due [would] be at the anniversary date of the policy"). As Judge Saylor explained, because Provident/Nationwide had customarily provided such notice and had an obligation to provide such notice, and because the Policy Statement was inadequate in this respect, introduction of the Policy Statement would have confused the jury, and the court therefore properly exercised its discretion to exclude "potentially misleading or confusing evidence." *Id.* at 13 (quoting *Turney Media Fuel, Inc. v. Toll Bros.,* 725 A.2d 836, 839 (Pa.Super.1999)). Again, given his sound reasoning, we cannot conclude that Judge Saylor's decision to exclude evidence that Furman "should have known" what, if anything, was due on the policy for 2001 was an abuse of discretion.[7]

7. In addition to the Policy Statement, which was primarily at issue, Nationwide also argues that the trial court abused its discretion by refusing to admit what Nationwide characterizes as other evidence that Furman knew or should have known that a premium payment would be due and that they should have known the amount due. This proffered evidence included, for example, a "Sequence of Events" timeline Mr. Dubendorf had prepared in August of 2002 in conjunction with his and Mr. Geise's complaint to the Pennsylvania Department of Insurance regarding Provident/Nationwide's denial of benefits. However, none of the proffered evidence supported Nationwide's claim that Furman had timely notice of the amount, if any, it would have to pay on the premium to keep the Kohl policy in force for 2001–2002. Accordingly, we find that Judge Saylor did not abuse his discretion for the same reasons discussed above with regard to his decision to exclude the Policy Statement.

Additionally, we note that Nationwide premises this argument on their repeated contention that Judge Saylor misapprehended the holding in *Kaeppel* by requiring them to send Furman notice of premium due in "a particular format" or "in the same format as previous notices." *See* Provident/Nationwide's brief at 27, 30. However, Judge Saylor never indicated that notice had to be in any particular format. Rather, he correctly held, in congruence with *Kaeppel,* that, due to the characteristics of the policy and the custom of providing notice, Provident/Nationwide was obligated to provide notice of the amount due on the premium, if any, from its insured.

Nationwide also argues that it should have been permitted to use some of this same evidence to impeach Mr. Geise's and Mr. Dubendorf's credibility. This point is not suggested by the statement of questions involved portion of Nationwide's brief, *see supra.* According to our rules of appellate procedure, "ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby." Pa.R.A.P. 2116(a).

Nevertheless, we examined this argument and have found no abuse of discretion. "[A] party may impeach the credibility of an adverse witness by introducing evidence that the witness has made one or more statements inconsistent with his trial testimony." *Rissi v. Cappella,* 918 A.2d 131, 139 (Pa.Super.2007) (citation omitted). Nationwide argues, for example, that the court should have allowed it to admit the Policy Statement to impeach Mr. Geise's contention that Furman did not receive notice because, according to Nationwide, Mr. Geise later relied on the Policy Statement in preparing his complaint to the Department of Insurance. However, as concluded above, the Policy Statement was inadequate to provide notice of the premium amount due. Moreover, Mr. Geise's testimony was that he did not recall seeing the faxed Policy Statement until after Mr. Kohl's death and he could not recall whether he used information in the Policy Statement to craft his complaint to the Department of Insurance.

¶ 26 In its next three issues, Provident challenges various aspects of the jury instructions provided by the trial court.

Pennsylvania law makes clear that the court is bound to charge the jury "only on the law applicable to the factual parameters of a particular case and that it may not instruct the jury on inapplicable legal issues." *Angelo v. Diamontoni*, 871 A.2d 1276, 1279 (Pa.Super.2005), *appeal denied*, 585 Pa. 694, 889 A.2d 87 (2005) (quoting *Cruz v. Northeastern Hosp.*, 801 A.2d 602 (Pa.Super.2002)). "Consequently, where the record [evidence fails] to satisfy the elements of a particular legal doctrine, the court may not discuss that doctrine in its charge." *Id.* Challenges to a court's jury instructions are subject to an abuse of discretion standard of review. *Butler v. Kiwi, S.A.*, 412 Pa.Super. 591, 604 A.2d 270, 272 (1992), *appeal denied*, 531 Pa. 650, 613 A.2d 556 (1992).

*MacNutt v. Temple Univ. Hosp., Inc.*, 932 A.2d 980, 991 (Pa.Super.2007). Additionally,

[e]rror in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. In reviewing a trial

court's charge to the jury, we must not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety.

*Raskin v. Ford Motor Co.*, 837 A.2d 518, 522 (Pa.Super.2003). (quoting *Stewart v. Motts*, 539 Pa. 596, 654 A.2d 535, 540 (1995) (internal citations omitted)).

¶ 27 Specifically, in its second issue, Nationwide contends that the trial court erred by giving the following instructions regarding notice:

Now, an insurance company which has a standard custom or practice of giving notice of premiums due for such a length of time as to lead an insured to believe notice will be given cannot cancel the policy without first giving such notice. Because the law requires that Provident provide a premium notice prior to cancellation, if no notice of premium due was given by Provident, Provident could not cancel the policy even if Furman Enterprises should have known that some premium was due.

N.T. Vol. III at 136–137. Again, Nationwide's argument is premised on their continued contention (based primarily on Furman's receipt of the Policy Statement) that Furman knew or should have known of its 2001 premium obligation. We disagree with this contention, as explained above, and we conclude that this instruction sufficiently comports with the evidence properly admitted at trial and the *Kaeppel* decision relied upon by Judge Saylor.

¶ 28 In its third issue, Nationwide argues that the court erred in its instruction to the jury on the mailbox rule, which Nationwide argues entitled them to a re-

---

In all, Nationwide fails to establish the inconsistencies in Furman's witnesses' testimony. Thus, we will not disturb Judge Saylor's discretion to exclude evidence that Furman "should have known" the premium amount due, either as substantive evidence or impeachment evidence.

buttable presumption that the four documents Furman denied receiving (i.e., (1) the notice of premium that would have been sent prior to the May 14, 2001 due date; (2) the June 2001 late payment offer; (3) the letter of inquiry from Ms. Mehta in November of 2001; and (4) the letter of inquiry from Ms. Mehta in December of 2001, see N.T. Vol. I at 103–104; N.T. Vol. II at 67) were in fact received.

¶ 29 Under the mailbox rule, "[p]roof of mailing creates a rebuttable presumption of receipt of the mailed item." *Jones v. Prudential Prop. and Cas. Ins. Co.,* 856 A.2d 838, 845 (Pa.Super.2004). "Once this presumption is established, the party alleging that it did not receive the letter has the burden of establishing such, and merely asserting that the letter was not received, without corroboration, is insufficient to overcome the presumption of receipt." *Donegal Mut. Ins. Co. v. Insurance Dept.,* 719 A.2d 825, 827 (Pa.Cmwlth. 1998).

> However, it is axiomatic that for the presumption of the receipt of a letter to be triggered, as a threshold evidentiary requirement, the party who is seeking the benefit of the presumption must adduce evidentiary proof that the letter was signed in the usual course of business and placed in the regular place of mailing.... "A presumption that a letter was received cannot be based on a presumption that the letter was mailed." *Commonwealth Department of Transportation v. Whitney,* 133 Pa.Cmwlth. 437, 575 A.2d 978, 979 (1990). "A presumption cannot be based on a presumption." *Id.; See also Paul v. Dwyer,* 410 Pa. 229, 188 A.2d 753, 756 (1963) (where controverted factual issue exists as to whether letter has been mailed, there is no presumption applicable to this determination).

*Commonwealth v. Thomas,* 814 A.2d 754, 758–59 (Pa.Super.2002) (footnote omitted).

¶ 30 Judge Saylor instructed the jury on the mailbox rule as follows:

Provident claims that it mailed the notice of premium due and the late payment offer. Furman Enterprises has denied receipt of each of these documents. As a result, this case is governed by the Mailbox Rule, which is the law in Pennsylvania. Under this rule, depositing a properly addressed letter with prepaid postage with the U.S. Postal Service raises a presumption that it reached its destination in due course. The Mailbox rule may also be invoked by proving that a letter had been written and signed in the usual course of business and placed in the regular place of mailing.

Provident, the party seeking to invoke the presumption of receipt, must offer direct evidence that the notice of premium due and the late payment offer were deposited in a post office or were prepared in the regular course of business and placed in the regular place of mailing. Provident must show by direct evidence that it actually mailed the notice of premium due and the late payment offer to Furman Enterprises.

Mailing must be proved by direct evidence. There must be some direct evidence, either that an item was prepared and deposited in the mail or prepared and placed in the usual place of mailing, in order for the presumption of receipt of that item to apply.

Evidence may either be direct evidence or circumstantial evidence. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw, heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You may decide

the case solely based on circumstantial evidence.

Mailing cannot be proven by circumstantial evidence. You cannot find that the notice of premium due or the late payment offer were received if the only evidence is that Provident presumed that these documents were mailed.

Now, you have heard what the law calls circumstantial evidence. Circumstantial evidence consists of proof of facts or circumstances from which it is reasonable to infer the existence of another fact. You may consider circumstantial evidence in your deliberation.

If you find that Provident has proven by a preponderance of direct evidence that the notice of premium due and the late payment offer were actually mailed to Furman Enterprises, you must then consider whether Furman Enterprises has introduced evidence sufficient to rebut the presumption of receipt under the Mailbox Rule. Mere denial of receipt of the items mailed is insufficient to rebut the presumption of receipt. If the denial of receipt is collaborated by surrounding circumstances, however, you may consider the denial of receipt together with the surrounding circumstances to determine whether Furman Enterprises has rebutted the presumption of receipt.

N.T. Vol. III at 137–39.

¶ 31 Nationwide essentially contends that, in this instruction, Judge Saylor failed to convey that "when a letter has been written and signed in the usual course of business and placed in the regular place of mailing, *evidence of the custom of the establishment* as to the mailing of such letters is receivable as evidence that it was duly mailed." Nationwide's brief at 46 (quoting *Christie v. Open Pantry Food Marts*, 237 Pa.Super. 243, 352 A.2d 165, 166–67 (1975)) (emphasis added by Nationwide). *See also* Nationwide's brief at 58

("A proper instruction would have informed the jury that evidence of the custom of the establishment as to the mailing of such letters is sufficient to raise the presumption under the Mailbox Rule that the letters were received."). However, in making this argument, Nationwide seems to ignore parts of the charge where Judge Saylor did in fact convey this proposition to the jury as when he stated, for example, "[t]he Mailbox rule may also be invoked by proving that a letter had been written and signed in the usual course of business and placed in the regular place of mailing." N.T. Vol. III at 137. Indeed, as Judge Saylor explained:

> Three times in the instructions, the jury was told that the "mailbox rule" can be invoked by proof that the item was prepared in the regular course of business and placed in the usual place of mailing. These references to mailing made in the usual and regular course of business amply conveyed to the jury that a company's business practices may be considered by them in reaching their ultimate conclusion as to whether a particular item had been mailed.

T.C.O. at 10.

¶ 32 Moreover, Judge Saylor put no restrictions on Nationwide's ability to present detailed "evidence of the custom of the establishment as to the mailing of such letters[,]" and Nationwide did indeed present such evidence. Nevertheless, the jury apparently determined that the evidence adduced by Nationwide with regard to their mailing procedures was inadequate to establish the fact of mailing, which is a necessary predicate to finding a presumption of receipt. This conclusion is supported by the record.

¶ 33 For example, Nationwide presented extensive testimony from Margie Aughey, Provident's manager of distri-

bution services, regarding its mailroom customs and procedures. N.T. Vol. II at 74–105. Included therein, however, was evidence that, once notices leave Nationwide's mailroom, they are sent to a third-party pre-sort house where they are commingled with mail from other companies prior to delivery to the U.S. Post Office. *Id.* at 93, 101. Also, occasionally, the inserter machine in the mailroom malfunctions, jams, or rips a notice. *Id.* at 101. Ms. Aughey further admitted that, on occasion, notices are not properly printed on the paper, but may still be placed in the mailroom's inserter machine in preparation for mailing. *Id.* Ms. Aughey admitted there is no way that she or anyone else at Provident would have specific knowledge with regard to whether the premium notice or the late payment notice in this case was actually mailed. *Id.* at 104–105. With regard to the letters individually prepared by Ms. Mehta, both Ms. Aughey and Ms. Mehta admitted that once someone places an individually-generated letter in a mail station on their floor, there is no way for them to know whether it was actually mailed. *Id.* at 103, 124.

¶ 34 By way of further example, and contrary to Nationwide's position, the computerized billing lists that it generates do not necessarily establish the fact of mailing. Indeed, when cross-examined with several letters from other policyholders to Provident, complaining that they had not received premium notices prior to their policies lapsing, Mr. DuBois admitted that the billing list does not indicate whether the premium notice or late payment offer were mailed. N.T. Vol. III at 65, 72. Mr. DuBois could only presume that the notices had been mailed. *Id.* He admitted that Provident did not get any proof of mailing from the post office. *Id.* He fur-

ther admitted that he did not know if any of the notices or letters were mailed and neither could Provident. *Id.* at 74–75, 80.

■■■ ¶ 35 Thus, the jury could reasonably conclude that Nationwide could only presume that the documents were mailed and, as Judge Saylor aptly noted, in reliance on *Thomas*, "[a] presumption that a letter was received cannot be based upon a presumption that the letter was properly mailed. A presumption cannot be based on a presumption." *Thomas*, 814 A.2d at 761 (quoting *Commonwealth Dep't of Transp. v. Whitney*, 133 Pa.Cmwlth. 437, 575 A.2d 978, 979 (1990)). Moreover, the "question of whether an individual item was actually prepared and mailed is a purely factual determination and, as the Supreme Court has made clear, there is no presumption applicable to the resolution of such a question." *Id.* Thus, it was within the province of the jury to determine, with assistance from the proper mailbox rule instruction provided by Judge Saylor, that Nationwide, despite the detailed description of their office and mailroom procedures, did not establish the fact of mailing and could not, therefore, benefit from a presumption that Furman received certain mailings.

■■■ ¶ 36 In its fourth issue, Nationwide contends that Judge Saylor should have used the jury instructions on notice and the mailbox rule that Nationwide proffered. Nationwide relies on its previous argument that Judge Saylor's instructions on these issues were erroneous. However, we have determined that Judge Saylor's instructions as a whole were adequate and clear. *See Raskin*, 837 A.2d at 522. Accordingly, Nationwide does not persuade this Court that it is entitled to a new trial on this basis.[8]

---

8. Our standard of review of the trial court's denial of a new trial is deferential: "[t]he

decision whether to grant or deny a new trial is one that lies within the discretion of the

¶ 37 Finally, in its fifth issue, Nationwide asserts that the trial court misapplied the mailbox rule resulting in the erroneous denial of Nationwide's motions for summary judgment and directed verdict.[9] These motions were premised on Nationwide's contentions that Furman had actual notice of the premium amount due in 2001 and that Furman is presumed to have received its notices under the mailbox rule. These contentions are meritless, as thoroughly explained *supra*. Accordingly, Judge Saylor did not err or abuse his discretion by refusing Nationwide's motion for summary judgment and motion for a directed verdict.

¶ 38 Judgment affirmed.

trial court, and that decision is not subject to being overturned on appeal unless the trial court grossly abused its discretion or committed an error of law that controlled the outcome of the case." *Gianni v. William G. Phillips, Inc.*, 933 A.2d 114, 116 (Pa.Super.2007) (citation omitted).

9. "Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion." *Englert v. Fazio Mech. Servs., Inc.*, 932 A.2d 122, 124 (Pa.Super.2007) (citation omitted).

Similarly, when reviewing the denial of a motion for a directed verdict:

> [W]e may only ask whether the trial court's decision was an abuse of discretion or an error of law that controlled the outcome of the case. The trial judge, however, may only grant a directed verdict motion where "the facts are clear and there is no room for doubt." In so determining, the trial court "must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony."

*Faherty v. Gracias*, 874 A.2d 1239, 1246 (Pa.Super.2005) (citations omitted).