J-S08017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| GEORGE L. GILLIARD | : | |
| | : | |
| Appellant | : | No. 1501 EDA 2025 |

Appeal from the Judgment of Sentence Entered May 2, 2025
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0000865-2022

BEFORE: PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JUNE 26, 2026**

George Gilliard appeals from the judgment of sentence entered after he was convicted of rape of a child and related offenses concerning his then-7-year-old granddaughter M.J.[1]  He challenges the sufficiency of the evidence to sustain all of his convictions, the admissibility of out-of-court statements from M.J.'s younger sister, the denial of his motion to continue trial during his case in chief, the trial court's ruling on the weight of the evidence from his non-jury trial, and the discretionary aspects of his sentence.  We affirm.

On the night of December 13, 2020, M.J. told her mother that "Pop Pop George" touched her inappropriately the previous summer.  Based on the ensuing investigation, the Commonwealth charged Gilliard with rape of a child

---

[1] 18 Pa.C.S. §§ 3121(c) (rape of child), 6318(a)(1) (unlawful contact with a minor), 3126(a)(2) and (7) (indecent assault by forcible compulsion and with a person less than 13 years old, and 6301(a)(1)(i) (corruption of minors).

and other crimes. Prior to trial, the Commonwealth moved to admit out-of-court statements from M.J. and M.J.'s sister.

The trial court held a hearing on the Commonwealth's motion on December 13, 2022. Mercedes Williams, both girls' mother, testified about what M.J.'s sister said about the incident:

[By the prosecutor:] And you said that that was the only time you talked to [M.J.] about [Gilliard touching her], is that correct?

A. Yes, because shortly after that, they got interviewed at an agency. I don't even remember --

Q. Is it the Child Advocacy Center?

A. Yes. And they told me not to question the children or ask about it. So I talked to [M.J.'s sister] before they even got the interview.

Q. Okay. So you . . . only talked to [M.J.] that one time, and then you stopped talking to her about it because that's what they told you to do?

A. Yes.

Q. But you did talk to [M.J.'s sister]?

A. I asked [her] maybe two questions before she got interviewed.

Q. And that was the only time you talked with her?

A. That was the only time I talked to them.

Q. Where were you with [M.J.'s sister] when you talked to her?

A. We was in the car.

Q. Where were you going?

A. We was going up to the Child [Advocacy Center].

\* \* \*

- 2 -

Q.  Okay.  So when you were going to the Child Advocacy Center, how did the conversation start?

A.  I just asked [M.J.'s sister], "do you remember the time you was at Pop Pop George house for the party?"  And she said, "yes." I said, "do you remember when you and [M.J.] was going outside to go play in the backyard and you guys was holding hands?"  She said, "yes."  I asked her -- I said, "do – "did Big George call [M.J.] back?"  And she said "yes."  I said, "well, what happened?"  She said, "[M.J.] let go of my hand and she went along."  And I said, "well, where did you go?"  She said, "I went in the backyard and I started playing," and that was it.

N.T., 12/13/22, at 61–63 (some punctuation added).  She clarified what M.J.'s

sister said she remembered:

She said her and [M.J.] – [M.J.] wanted to go play outside, and [M.J.] said [her sister's name], let's go play outside.  The two of them started to go in the backyard, they was holding hands, and Pop Pop George called [M.J.] and said that he have something for her.  The two of them separated, and [M.J.'s sister] continued to go outside.  She said that's what she remembered because that's all I asked her . . . because she didn't know about the situation yet until [M.J.] mentioned it to my aunt.  That's how [M.J.'s sister] found out.

*Id.* at 65.

On December 16, 2022, the trial court granted the Commonwealth's

petition in part; all of M.J.'s statements would be admissible at trial.  However,

Gilliard requested a taint hearing with respect to statements from M.J.'s sister.

The trial court heard argument on January 10, 2023, and addressed the issue

of taint at a competency hearing on March 10, 2023.  There, M.J.'s sister

answered questions about herself, about the difference between a lie and the

truth, and about talking to her mother.

[By the prosecutor]: . . . [D]o you remember talking to your mom about a birthday party?

- 3 -

A.    Yes.

Q.    Yeah?  And a birthday party that involved your grandfather?

A.    I think so.

Q.    Okay.  And who's . . . your grandfather?

A.    Pop Pop George.

Q.    Pop Pop George?  And where did you have this conversation with your mom?

A.    In the car.

Q.    In the car?  And when you talked to your mom in the car, did you remember what you talked about?

A.    No.

Q.    No?  It's okay.  Did you talk about the party?

A.    No.

*    *    *

Q.    . . . [Y]ou yourself remember that party, right?

A.    Yes.

Q.    Okay.  And do you remember being at that party with your sister [M.J.]?

A.    Yes.

*    *    *

Q.    . . . [D]o you remember that party because you remember it or did your mom tell you about the party and that's why you remember it?

A.    I remember it.

Q.    . . . . [D]o you remember . . . whose party it was?

A.    Yes, but I forgot her name.

Q.    Okay.  And what kind of party was it?

A.    A birthday party.

> Q. Okay, and what did you do at this birthday party, anything fun?
>
> A. Yeah, we were in the pool and watched . . . a movie.

*See* N.T., 3/10/23, at 13–16 (formatting altered).

The trial court determined that M.J.'s sister, who did not remember what they talked about in the car, was not tainted. Noting that she "demonstrated memory and the ability to testify independent of undue influence and coercion and is found to be a competent witness," the court thus ordered that M.J.'s sister would be able to testify in Gilliard's case. Order, 3/13/23. The court separately granted the Commonwealth's tender years petition as applied to the out-of-court statements made by M.J.'s sister. Order, 9/9/24.

Before trial, Gilliard moved to allow an intended witness, Nicole Lewis, to testify via a virtual media platform. He averred that she resided in Georgia. "Due to expense, child care and family issues Ms. Lewis is unable to travel up to Pennsylvania for the trial." Defendant's Omnibus Motion in Limine, 7/11/24, at 9. In an alibi notice, Gilliard provided, "Ms. Lewis will testify that on Saturday, June 1, 2019 that George Gilliard was present at her house that evening for ~2 hours from 8pm to 10pm. She specifically remembers speaking with him in her dining room." Supplemental Notice of Alibi Defense, 7/11/24, at 2. "She will further testify that George Gilliard was in and out of her house that weekend starting on Friday, May 31, 2019 and continuing through Sunday, June 2, 2019." *Id.*

The trial court heard Gilliard's motion the Thursday before trial. Counsel indicated that Ms. Lewis would be on a preplanned vacation in Mexico the

week of trial. The prosecutor expressed concern that Ms. Lewis would not be available to testify virtually. The trial court reasoned, "The worst thing that can happen is the Defendant would ask for a continuance to allow for his witness to appear. And I would have to make a decision . . . on that." N.T., 9/5/24, at 11. Defense counsel agreed. The trial court granted permission to present Ms. Lewis' testimony through Teams.

Gilliard's non-jury trial commenced on September 10, 2024. The Commonwealth presented eight witnesses over the first two days of trial, including M.J. M.J. frequently testified that she did not remember details of what Gilliard did to her; however, she agreed with the prosecutor's direct questioning that Gilliard's body part went "inside the part that you [pee] from," which she circled on a diagram. N.T., 9/10/24, at 77. Pursuant to the pretrial ruling, M.J.'s out-of-court statements to her mother and to the forensic interviewer were admitted. The trial court later recounted the testimony of the witnesses presented by the Commonwealth:

> The Commonwealth's first witness was Amira Glasgow, the ex-girlfriend of Mr. Gilliard's son. Ms. Glasgow said that M.J. and her sister stayed overnight at Mr. Gilliard's house from May 25 through May 27, 2019, and then again from June 1 to June 2, 2019. Ms. Glasgow said that M.J. and her sister were dropped off at Mr. Gilliard's house by their mother, Mercedes [Williams], at Mr. Gilliard's home on Saturday, June 1, 2019, to attend a birthday party. Ms. Glasgow and her own daughter also slept overnight at Mr. Gilliard's house on June 1, 2019. Ms. Glasgow said approximately fifteen grandchildren slept at Mr. Gilliard's house that night and that when all the children slept over they usually slept together in the living room or an upstairs bedroom. The trial court found Ms. Glasgow's testimony to be credible.

The Commonwealth's second witness was M.J., who was twelve years old at the time of trial. M.J. testified that something happened with her body and Mr. Gilliard when she was younger than ten years old at Mr. Gilliard's house in his bedroom.[2] The Commonwealth provided M.J. with a diagram of a little girl's body. Using a blue pen, M.J. circled which of her body parts were touched by Mr. Gilliard's body. Using a red pen, M.J. circled which of Mr. Gilliard's body parts touched M.J.'s body. [Both circles were on the genitals.] M.J. explained that they were on the bed when Mr. Gilliard's body part that he pees from went inside the part of her body that she pees from.

On cross-examination, M.J. said that during a party at Mr. Gilliard's house, she and Mr. Gilliard went to his bedroom while everyone else was outside. When asked if Mr. Gilliard put his "front private part" into her "front private part," M.J. answered, "yes." M.J. was unable to remember many details of the day she was assaulted. However, M.J. clearly indicated, albeit through a combination of pictures and words as set forth above, that Mr. Gilliard put his penis in her vagina. The trial court found M.J.'s testimony to be credible.

The Commonwealth's third witness was Dr. Joann Wood, the attending physician of pediatric hospital medicine and child abuse pediatrics at Children's Hospital of Philadelphia ("CHOP"), as well as section chief of CHOP's Safe Place child maltreatment program. Dr. Wood was also an associate professor of pediatric medicine at the University of Pennsylvania School of Medicine. Dr. Wood said she was board certified in child abuse pediatrics, general pediatrics, and pediatric hospital medicine. Dr. Wood was qualified as an expert in child abuse pediatric medicine.

Dr. Wood reviewed M.J.'s medical record created from her visit to the CHOP emergency room and concluded that M.J.'s examination was normal. Dr. Wood said that M.J.'s exam did not indicate whether sexual abuse occurred or not. The trial court found Dr. Wood's testimony to be credible.

The Commonwealth's fourth witness was M.J.'s ten-year-old sister. She said that she and M.J. were at Mr. Gilliard's house for a pool party and left the bathroom after changing into bathing suits. As they walked from the bathroom, Mr. Gilliard called M.J. into his bedroom and M.J. went to him. M.J.'s sister said she

_____

[2] Based on M.J.'s birth date, she was seven years old in the summer of 2019.

waited for M.J. to come out of the bedroom and when M.J. did not come out, she went outside to get into the pool.

M.J.'s sister said she knew she was in court because Mr. Gilliard touched M.J. She said that after the pool party, she and M.J. left with their mother. While in the car with their mother, M.J. told their mother that Mr. Gilliard had touched M.J. M.J.'s sister could not remember many details of the day or who else was at the party. She did not give details of what M.J. said to their mother. Her testimony corroborated M.J.'s story that M.J. was in Mr. Gilliard's bedroom alone with him on the day of the party.

The Commonwealth's fifth witness was Mercedes Williams, M.J.'s mother. Ms. Williams said that in December, 2020, M.J. told her that in June, 2019, during a party at his house, Mr. Gilliard called M.J. into his bedroom, told her to get undressed, and then tried to put something "hard and wet" into her body. When Ms. Williams picked up her two daughters from Mr. Gilliard's home, she asked them if they had fun at the party. In response to Ms. Williams' question, M.J.'s sister said she had fun, but M.J. was quiet.

Ms. Williams testified that Mr. Gilliard called her the day after she picked her children up from his house and said if the children told her anything that they were lying. Ms. Williams asked what Mr. Gilliard was talking about and asked if everything was okay. Mr. Gilliard said everything was okay and that he would call her back, but Mr. Gilliard never called Ms. Williams back. Ms. Williams learned that Mr. Gilliard had embarrassed M.J. by asking her in front of other people if she knew who her father was, and M.J. did not know. Based on that embarrassing incident, Ms. Williams said that her children did not see Mr. Gilliard after the weekend of June 1, 2019.

Ms. Williams and her ex-husband met with Mr. Gilliard on or about June 8, 2019. At the meeting, Ms. Williams confronted Mr. Gilliard about lying to her when he said everything was okay and that the children were lying if they told her anything. Ms. Williams told Mr. Gilliard she was aware he had asked M.J. if she knew who her father was. Mr. Gilliard denied that he had lied to Ms. Williams. The meeting ended when Ms. Williams' ex-husband punched Mr. Gilliard in the face.

After the meeting with Ms. Williams and her ex-husband, Mr. Gilliard threatened Ms. Williams and her ex-husband with

violence via text messages to Ms. Williams' phone. Ms. Williams produced phone records in support of her story. Except for court proceedings, there was no contact between Mr. Gilliard and M.J. or her family since the June 8, 2019, meeting and subsequent text messages. The trial court found Ms. Williams' testimony to be credible.

The Commonwealth's sixth witness was Officer William Kozlowski, of the Philadelphia Police Department. Officer Koslowski took M.J.'s statement at her mother's house on December 14, 2020, at approximately 12:15 a.m. M.J. was sobbing uncontrollably and reported that in June, 2019, Mr. Gilliard promised to give her a toy if she went to his bedroom. When she got to Mr. Gilliard's bedroom, he removed her pants and panties and sexually assaulted her by rubbing her vagina with his hand and inserting a long white object into her vagina. A second sexual assault took place on a different day during the same weekend visit when Mr. Gilliard removed M.J.'s panties and rubbed M.J.'s buttocks. After Officer Kozlowski took M.J.'s statement, he made a report of it and the case was transferred to Delaware County. Officer Kozlowski's bodycam footage [of receiving M.J.'s statement] was played in the courtroom and corroborated Officer Kozlowski's testimony. The trial court found Officer Kozlowski's testimony to be credible.

The Commonwealth's seventh witness was Chief Steven Ziviello of the Aldan Borough Police Department. On December 14, 2020, M.J.'s mother called Chief Ziviello to report a sexual assault against M.J. Chief Ziviello said M.J. told him that Mr. Gilliard said he had a toy for her in the bedroom. M.J. went to the bedroom, where Mr. Gilliard threw her on the bed and got undressed and got into bed with her. Mr. Gilliard placed a white substance on a hard object and rubbed it on her vagina. Chief Ziviello said M.J. also described a second incident during the same visit where Mr. Gilliard rubbed her thighs and buttocks over her clothes. The trial court found Chief Ziviello's testimony to be credible.

The Commonwealth's eighth witness was Detective James Simpkins from the Delaware County Criminal Investigative Division Child Abuse and Human Trafficking Unit. Detective Simpkins became involved in the case to investigate the [first] alibi defense asserted by Mr. Gilliard [with a statement from his wife]. The alibi defense indicated that Mr. Gilliard and his wife were at a funeral on June 1, 2019, there were no parties at Mr.

Gilliard's home in 2019, and no children slept at Mr. Gilliard's home in 2019.  Detective Simpkins obtained video evidence from Amira Glasgow of a party at Mr. Gilliard's home where his wife was present with M.J. and her sister on June 1, 2019, proving that Mr. Gilliard's alibi was untrue.

*See* Trial Court Opinion, 8/22/25, at 2–7 (many stylistic revisions; footnotes and record citations omitted).

In the morning on the second day of trial, defense counsel advised that he intended to call "two, possibly three" witnesses and that the defense was "trying to get somebody on Teams." *See* N.T., 9/12/24, at 107.  Later, after Gilliard presented testimony from Rebecca Hill, defense counsel spoke to the trial court off the record about scheduling. *Id.* at 189.

On the third day of trial, Gilliard presented testimony from four additional witnesses.  The trial court later recounted the substance of their testimony:

> Mr. Gilliard's first witness was Rebecca Hill.  Ms. Hill was called as an alibi witness and said she had hosted a birthday party for her daughter on June 1, 2019.  Ms. Hill said Mr. Gilliard's wife attended the party with M.J. and her sister but that Mr. Gilliard was not there with them.  When Ms. Hill was first interviewed by CID Detective Thomas McNichol, she said Mr. Gilliard had been at the party on June 1, 2019, but later changed her story to say he was not there.

> Mr. Gilliard's second witness was his wife, Dion Gilliard, who was also called as an alibi witness.  Regarding Mr. Gilliard's alibi that proved to be false, Mrs. Gilliard said she was being truthful but had been mistaken as to time and later corrected herself.  Mrs. Gilliard maintained that Mr. Gilliard had not been present at any birthday party on June 1, 2019, and that she could not recall if M.J. and her sister had slept at her house.

> Mr. Gilliard's third witness was his daughter, Mercedes Gilliard.  Mercedes said she was at Mr. Gilliard's home on May 25, 2019, for approximately ten minutes to announce to her family

that she was leaving for army training before being deployed. Mercedes said no children were present while she was at her father's house.

Mr. Gilliard's fourth witness was Vanessa Jones-Christmas, the aunt of Mr. Gilliard's two oldest children. Although Ms. Christmas alluded to being called as a character witness for Mr. Gilliard, she did not provide any substantive testimony, factual, character, or otherwise.[3]

Trial Court Opinion, 8/22/25, at 8–9 (stylistic revisions; record citations omitted).

After the testimony of Ms. Christmas, defense counsel apprised the trial court that a final witness, Nicole Lewis, was unavailable. The court denied a continuance:

THE COURT: All right. Any other witnesses?

[Defense counsel]: We have the one witness, Judge, that was supposed to be a Team. We've not been able to get a hold of her. I mentioned that yesterday. We're just asking that this case be postponed, so we can call Nicole Lewis, as she is an [alibi] witness in this matter in this case.

THE COURT: Your response?

[Prosecutor]: Commonwealth objects.

THE COURT: All right. Request is denied. We will have closings at 1:30. We'll recess this case to 1:30.

N.T., 9/13/24, at 72 (commas added). Gilliard did not present any testimony from any additional witnesses or testify on his own behalf.

_____

[3] Gilliard stated that he called Ms. Christmas, who had been sitting in the courtroom throughout trial, to impeach Ms. Williams' statement that she had custody of M.J. and her sister. N.T., 9/13/24, at 59. She also testified about family pressure regarding her willingness to testify. *Id.* at 63.

On September 20, 2024, the trial court returned a verdict of guilty at all counts.

Gilliard moved for a new trial on January 16, 2025, citing the apparent recantation of Commonwealth witness Amirah Glasgow. The Commonwealth responded on February 13, 2025. The trial court denied the motion on February 26, 2025.

Gilliard appeared for sentencing on May 2, 2025. The trial court detailed its review of the pre-sentence investigation report. The court summarized the parties' sentencing submissions. The Commonwealth and Gilliard presented information and recommendations. Notably, Gilliard argued that his previous offenses would "lapse" under the eighth edition of the sentencing guidelines, resulting in a lower prior record score and lower guidelines than under the seventh edition. All agreed, however, that the seventh edition guidelines applied to Gilliard's 2019 crimes. The trial court described its considerations in imposing sentence:

> THE COURT: . . . I considered the sentencing guidelines, the pre-sentence investigation report, various evaluations and submissions that I went through. I did consider the circumstances of the offense.
>
> These cases are difficult cases in that when the Defendant denies the crime happened, it's difficult to advance the idea of rehabilitation. The Defendant is taking the position he doesn't need to be rehabilitated; he didn't commit a crime. The Commonwealth presented evidence sufficient to meet its burden of proof on the charges that they brought.
>
> The Defendant was found guilty. So, you're left with protection of the public and a sanction for a horrible crime. The guidelines provide some guidance. They're not . . . chemistry or

any exact science, but they do provide what they are, they're guidelines.

I went through the circumstances of the Defendant in reviewing the submissions, so I'm not going to do that again. It's safety of the public as the Commonwealth has argued and the needs of the community and gravity of the offense. I think it's fair to say that although the Defendant has a long criminal history, this is the first crime of a sexual nature in the Defendant's record, which -- aberration is probably too strong a word, but it's out of his normal fact pattern for his criminal history. Unfortunately, it's a fact that there are a lot of folks that go a lifetime without committing a criminal offense and then commit a criminal offense. It doesn't make it less of an offense.

I think it's more challenging for the family to understand and process that when that occurs. I did consider the Defendant's history, good and bad. As his wife said, he has a devoted wife and extended family who want to believe the Defendant that he didn't do it.

Unfortunately, he was convicted of several serious crimes . . . . The Defendant does present some physical challenges during incarceration. He's not the only elderly or sick or disabled defendant in the state Department of Corrections, and they do have facilities to deal with that.

I think the aggravating factor of the victim's age and seriousness of the crime are all reflected in the sentencing guidelines and the mandatory minimum. I did note that the Defendant's prior record score of four. I did hear, clearly, Defense Counsel's argument about the different ways of calculating between the 7th edition and 8th edition sentencing guidelines.

N.T., 5/2/25, at 22–24.

The trial court then sentenced Gilliard to an aggregate term of 16 to 32 years of confinement followed by 3 years of probation, with a report date of May 16, 2025. Gilliard filed post-sentence motions on May 12, 2025. Notably, he included the new information that Nicole Lewis was on an airplane at the time he requested a continuance. The trial court denied Gilliard's post-

sentence motions on May 30, 2025. Gilliard timely appealed. Gilliard and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Gilliard presents the following issues for review:

1. Was the evidence insufficient to support finding [Gilliard] guilty beyond a reasonable doubt on the charge of rape of a child (18 Pa.C.S.A. § 3121(c))?

2. Was the evidence insufficient to support finding [Gilliard] guilty beyond a reasonable doubt on the charge of unlawful contact with a minor - sexual offenses (18 Pa.C.S.A. § 6318(a)(1))?

3. Was the evidence insufficient to support finding [Gilliard] guilty beyond a reasonable doubt on the charge of indecent assault - forcible compulsion (18 Pa.C.S.A. § 3126(a)(2))?

4. Was the evidence insufficient to support finding [Gilliard] guilty beyond a reasonable doubt on the charge of indecent assault - victim less than 13 years (18 Pa.C.S.A. § 3126(a)(7))?

5. Was the evidence insufficient to support finding [Gilliard] guilty beyond a reasonable doubt on the charge of corruption of minors (18 Pa.C.S.A. § 6301(a)(1)(i))?

6. Did the trial court err and abuse its discretion in granting the Commonwealth's petition to admit out-of-court statements under the tender years hearsay exception, including statements that were made by [M.J.'s sister] to Mercedes Williams and Crystal Gray, given the tainted nature of these statements?

7. Did the trial court err and abuse its discretion in denying [Gilliard's] request for a continuance to allow for a key alibi witness, Nicole Lewis, to be procured to provide testimony, in a way that impacted [Gilliard's] right to a fair trial?

8. Did the trial court err and abuse its discretion by finding [Gilliard] guilty on all charges, against the weight of the evidence, where Commonwealth witnesses provided an immense amount of contradictory testimony?

9. Did the trial court err and abuse its discretion by imposing a sentence upon [Gilliard] that is manifestly excessive, as the trial court did not consider the relevant factors under the

> Pennsylvania Sentencing Code, including [Gilliard's] rehabilitative needs, age, and background?

*See* Gilliard's Brief at 10–12 (reordered, capitalization omitted).

We first address Gilliard's challenges to the sufficiency of the evidence to sustain his convictions, as Gilliard would be discharged if these claims succeed. *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) (*en banc*). For each crime, Gilliard argues that the testimony of M.J. and the other Commonwealth witnesses was vague and contradictory, such that the evidence was insufficient to prove the specific time and place of the incident. Additionally, Gilliard challenges whether M.J.'s testimony established certain elements of each crime.

In reviewing a sufficiency challenge, we must determine "whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Gilliam*, 249 A.3d 257, 267 (Pa. Super. 2021) (quoting *Commonwealth v. Smith*, 206 A.3d 551, 557 (Pa. Super. 2019)).

> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the

> finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Id.* This standard does not generally require corroboration for a reviewing court to uphold a conviction. "A complainant's testimony alone is sufficient to sustain a conviction for a criminal offense, 'so long as that testimony can address and, in fact, addresses, every element of the charged crime.'" *Commonwealth v. Horlick*, 296 A.3d 60, 62 (Pa. Super. 2023) (quoting *Commonwealth v. Johnson*, 180 A.3d 474, 481 (Pa. Super. 2018)). This principle holds true for sexual offenses, which decisional and statutory law recognize can be proven by uncorroborated testimony of a complainant. *See Commonwealth v. Banniger*, 303 A.3d 1085, 1091 (Pa. Super. 2023) (citing *Commonwealth v. Poindexter*, 646 A.2d 1211, 1214 (Pa. Super. 1994), and 18 Pa.C.S. § 3106). Moreover, out-of-court statements from witnesses can be sufficient to sustain a conviction even if they contradict testimony from trial. *See Commonwealth v. Brown*, 52 A.3d 1139, 1171 (Pa. 2012).

Here, M.J.'s trial testimony and prior out-of-court statements provided a narrative that the trial court was free to believe. Notably, M.J.'s inability at trial to remember certain details of Gilliard abusing her nearly five years earlier does not mandate a conclusion that the abuse did not occur. The extent of M.J.'s memory was a factor that the trial court could consider in determining whether the Commonwealth met its burden of proof. For sufficiency purposes, the trial court could accept the assertions of M.J.'s prior statements. From the time of her initial disclosure through trial, M.J. maintained that Gilliard

touched her inappropriately while she was at his house in the summer of 2019. The rest of the documents and testimony from trial narrowed down the dates that M.J. was in Gilliard's presence. That some evidence contradicted the Commonwealth's theory means only that the trial court had to resolve a factual dispute. Judges and juries do this in every trial. Thus, if the court could reasonably find the elements of Gilliard's convictions from M.J.'s testimony, M.J.'s prior statements, or any other trial evidence, then Gilliard's sufficiency claims for those convictions fail.

As to his conviction for rape of a child, Gilliard argues that M.J.'s testimony did not establish the timeline of events or the element of penetration. As noted above, the trial court was free to credit M.J.'s testimony and reject other witnesses' assertions that there were no children's parties at Gilliard's house. The statute does not require proof that the rape occurred at a particular location or time, only that it occurred. Sexual intercourse, under Pennsylvania law, requires proof of "some penetration however slight." 18 Pa.C.S. § 3101 (definitions). This includes "entrance in the labia." *Commonwealth v. Ortiz*, 457 A.2d 559, 561 (Pa. Super. 1983). Here, M.J. agreed with considerable prompting that Gilliard's body part went "inside the part that you [pee] from," which she circled on a diagram. N.T., 9/10/24, at 77. (On appeal, Gilliard acknowledges that M.J. meant his penis.) The trial court did not need to speculate whether M.J. meant that Gilliard penetrated the outer limits of her labia, as M.J.'s statements to Crystal Gray were also in evidence: M.J. told the forensic interviewer that after Gilliard threw her on the

bed and took off her pants, Gilliard "put something hard inside me," meaning "My vagina." N.T., 9/12/24, at 34, 36 (transcribing playback of Exhibit C-8). The trial court could credit this evidence to find that Gilliard's conduct satisfied the requirement of penetration for the crime of rape of a child.

As to his conviction for indecent assault by forcible compulsion, Gilliard argues the evidence was too vague to establish forcible compulsion. "Although [Gilliard] concedes that [M.J.] had previously told a more complete story, [he] argues that [her] inability to remember this heinous incident, although she *was* able to recall the incident with perfect clarity more than a year after it allegedly occurred, is unbelievable. Additionally, the prior statements provided by [M.J.] had not been under oath." Gilliard's Brief at 47. This argument fails. The trial court as fact-finder was aware of the time between the alleged incident in 2019, M.J.'s disclosure 18 months later, and the trial in 2024. The trial court could accept M.J.'s statement to the forensic interviewer, which began with M.J. agreeing "to only tell the truth and talk about things that really happened." N.T., 9/12/24, at 24–25 (Ex. C-8). M.J.'s previous recollection that Gilliard threw her on the bed and pulled off her pants despite her resistance satisfies the requirement of forcible compulsion for the crime of indecent assault by forcible compulsion.

As to his conviction for indecent assault of a victim less than 13 years of age, Gilliard echoes his argument that the evidence was vague and contradictory. As above, the trial court could properly resolve inconsistencies in favor of finding facts that demonstrated Gilliard's guilt. Viewing the

evidence in a light most favorable to the Commonwealth as verdict winner, we thus reject Gilliard's sufficiency challenge for the crime of indecent assault of a victim less than 13.

As to his conviction for unlawful contact with a minor, Gilliard bases his argument on a lack of proof that he engaged in any sexual offense.[4] As noted above, the trial court could find that Gilliard committed a sexual offense and thus that the Commonwealth proved Gilliard's intent for unlawful contact with a minor.

As to his conviction for corruption of minors, Gilliard argues that the evidence was too vague and contradictory to establish that he committed sexual offenses against M.J., as would tend to corrupt her. As described above, the evidence was not so uncertain as to prevent the trial court from resolving factual disputes to find that Gilliard sexually abused M.J. Thus, the evidence is sufficient to sustain Gilliard's conviction for corruption of minors. Gilliard's sufficiency challenges fail.

We next address Gilliard's challenge to the pretrial ruling that out-of-court statements from M.J.'s sister would be admissible under the Tender Years Hearsay Act. *See* 42 Pa.C.S. § 5985.1.[5] Gilliard argues that these

---

[4] Gilliard does not challenge that he was "intentionally in contact with" M.J. when he said he had a toy for her or when he threatened her. 18 Pa.C.S. § 6318(a); *see Commonwealth v. Strunk*, 325 A.3d 530 (Pa. 2024).

[5] Although Gilliard's Rule 1925(b) statement also challenged statements from M.J. herself, Gilliard does not contest this portion of the trial court's ruling in his brief.

statements did not describe an enumerated offense and were not supported by sufficient indicia of reliability.

We review a trial court's evidentiary rulings, including tender years hearsay rulings, for an abuse of discretion. ***Commonwealth v. Copenhaver***, 316 A.3d 1020, 1023 (Pa. Super. 2024) (citing ***Commonwealth v. Curley***, 910 A.2d 692, 697 (Pa. Super. 2006)). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused." ***Commonwealth v. Talley***, 236 A.3d 42, 55 (Pa. Super. 2020) (quoting ***Geise v. Nationwide Life & Annuity Co. of Am.***, 939 A.2d 409, 417 (Pa. Super. 2007)). The statute provides a rule by which certain out-of-court statements from children are admissible at trial:

> **General rule.--**
>
> (1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 16 years of age or younger, describing any of the offenses enumerated in paragraph (2), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:
>
> > (i) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
> >
> > (ii) the child either:
> >
> > > (A) testifies at the proceeding; or
> > >
> > > (B) is unavailable as a witness.

- 20 -

42 Pa.C.S. § 5985.1(a)(1). Paragraph (2) includes, among other crimes, sexual offenses under Chapter 31 as well as unlawful contact with a minor. *Id.* § 5985.1(a)(2).[6, 7] Factors to consider "in assessing the reliability of hearsay statements . . . include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age, and the lack of a motive to fabricate." *Commonwealth v. Walter*, 93 A.3d 442, 456 (Pa. 2014) (citing *Commonwealth v. Delbridge*, 855 A.2d 27, 47 (Pa. 2003)).

Here, the out-of-court statements that M.J.'s sister told her mother and the forensic interviewer included Gilliard telling M.J. that he had a toy for her.

> [Forensic interviewer]: Okay. And tell me why did [M.J.] tell you that she was in Pop-pop's room?
>
> [M.J.'s sister]: She said, Pop-pop said I have your toy in the room.
>
> [Q]: Okay.
>
> [A]: A manual toy. And -- yeah.

N.T., 9/12/24, at 79 (playback of forensic interview). In light of M.J.'s report that Gilliard's promise of a toy led her to the bedroom where Gilliard touched

---

[6] At the time of the alleged offense in this case, this statute applied to statements from children "12 years of age or younger" and did not list the offense of unlawful contact with a minor. Regardless, the case properly proceeded under the version in effect at the time of the trial court's ruling. *See Commonwealth v. Allshouse*, 36 A.3d 163, 183 (Pa. 2012).

[7] Paragraph (2) also includes corruption of minors charged as a felony under 18 Pa.C.S. § 6301(a)(1)(ii). In this case, Gilliard was charged with the misdemeanor corruption offense under subsection 6301(a)(1)(i), which is not included in paragraph (2).

her, M.J.'s sister's statements at a minimum describe the offense of unlawful contact with a minor. As to indicia of reliability, the trial court explained:

> [M.J.'s] sister was calm during the CAC interview and indicated that she had not been coached. N.T., 9/12/24, at 74. [M.J.'s] sister had no motive to fabricate her story and repeated her memory of events with relative consistency to CAC and again at trial.

Trial Court Opinion, 8/22/25, at 14. We discern no abuse of discretion. The trial court reasonably balanced the pertinent factors to conclude that M.J.'s sister's statements bore sufficient indicia of reliability to be admissible at trial. Gilliard's tender years hearsay challenge fails.

We next address Gilliard's challenge to the trial court's denial of his request for a continuance to procure the testimony of Nicole Lewis, who was not available at the conclusion of Gilliard's case in chief. Gilliard argues that the resulting inability to present Lewis as an alibi witness deprived him of a fair trial.

A "trial court has broad discretion on the granting of continuances during trial." *Commonwealth v. Metzger*, 450 A.2d 981, 983 (Pa. 1982). Accordingly, a ruling on a motion for a continuance "will not be reversed in the absence of prejudice or a showing of palpable and manifest abuse of discretion." *Commonwealth v. Williams*, 640 A.2d 1251, 1260 (Pa. 1994) (citing *Commonwealth v. Sullivan*, 398 A.2d 978 (Pa. 1979)). To determine if the denial of a continuance was an abuse of discretion, a reviewing court should consider the nature of the crime and surrounding circumstances of trial. *Metzger*, 450 A.2d at 984. On a criminal defendant's request for a

continuance to secure a witness, the following factors determine whether the denial of a continuance was appropriate:

> (1) the necessity of the witness to strengthen the defendant's case;
>
> (2) the essentiality of the witness to the defendant's defense;
>
> (3) the diligence exercised to procure his or her presence at trial;
>
> (4) the facts to which he or she could testify; and
>
> (5) the likelihood that he or she could be produced at court if a continuance were granted.

*Commonwealth v. Small*, 741 A.2d 666, 683 (Pa. 1999) (citing *Commonwealth v. Thomas*, 717 A.2d 468 (Pa. 1998)).

The Supreme Court held that a trial court abused its discretion by denying a continuance to secure an alibi witness in *Commonwealth v. Howard*, 353 A.2d 438, 439 (Pa. 1976). There, "the only other alibi evidence" from trial was the defendant's own testimony, defense counsel had the witness subpoenaed and requested a bench warrant, and "information was received by the trial court" indicating that only a short continuance would be required. *Id.*

By contrast, a trial court's denial of a continuance is not an abuse of discretion where the absent witness' testimony would be cumulative to that of other witnesses. *Commonwealth v. Gibson*, 688 A.2d 1152, 1162 (Pa. 1997). Nor would a trial court abuse its discretion by denying a continuance if the court is given only "[v]ague unsupported assertions" about counsel's

efforts to locate a desired witness and there is no guarantee that the witness would be located even after a continuance. *Small*, 741 A.2d at 683.

Here, the trial court explained its assessment of the above factors in its opinion:

> [Gilliard] offered no excuse for the absence of his witness and readily admitted that he was unable to reach her. At the time of [Gilliard's] request this Court had heard and seen the Commonwealth's evidence in its entirety.
>
> Having already heard the testimony of [Gilliard's] two other alibi witnesses, this Court determined that the absent witness was not necessary to the defense as it would be cumulative. Moreover, the alibi upon which [Gilliard] relied was proved to be false by witness testimony from both sides as well as documentary and photographic evidence regarding times and locations of certain events. [Gilliard] offered no information regarding efforts made to procure the witness. Given that [Gilliard's] other family members had already testified at trial, it was unlikely that the absent witness would be produced.

Trial Court Opinion, 8/22/25, at 15.

Our review reveals no abuse of discretion or showing of prejudice. When the time came for Lewis' testimony after all other evidence had been presented, the trial court was not informed of the circumstances of her absence, Gilliard's efforts to secure her, or how much delay would be needed. It was not until Gilliard's post-sentence motion that he provided that Lewis was on an airplane at the time. As to the substance of Lewis' testimony, the trial court was aware that she would testify that Gilliard was at her house from 8:00 p.m. to 10:00 p.m. on June 1, 2019, and "was in and out of her house that weekend." Supplemental Notice of Alibi Defense, 7/11/24, at 2. As the finder of fact, the trial court rejected Gilliard's alibi based on effective

examination of witnesses by both parties and documentary evidence that showed the children were present that weekend. Even Gilliard being "in and out" of Lewis' house would not have precluded a finding that he also went to the event with the children long enough to separate M.J. from her sister and assault her. Under these circumstances, Gilliard's continuance challenge fails.

We next address Gilliard's challenge to the weight of the evidence. He argues the trial court abused its discretion by finding him guilty based on inconsistent and inaccurate testimony.

The law on a weight-of-the-evidence claim is well-established.

> The weight given to trial evidence is a choice for the factfinder. If the factfinder returns a guilty verdict, and if a criminal defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice.

> When a trial court denies a weight-of-the-evidence motion, and when an appellant then appeals that ruling to this Court, our review is limited. It is important to understand we do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. We do not decide how we would have ruled on the motion and then simply replace our own judgment for that of the trial court. Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.

> Moreover, when evaluating a trial court's ruling, we keep in mind that an abuse of discretion is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law. By contrast, a proper exercise of discretion conforms to the law and is based on the facts of record.

*Banniger*, 303 A.3d at 1095 (quoting *Commonwealth v. Arnold*, 284 A.3d 1262, 1277 (Pa. Super. 2022)). Notably, "there is a logical inconsistency in asking a trial judge to conclude that his non-jury decision shocked his own conscience." *Id.*

Here, the trial court explained why it concluded that its own verdict did not shock its sense of justice. Trial Court Opinion, 8/22/25, at 21–23. The trial court found M.J.'s testimony to be "credible and relatively consistent given her age and limited understanding of what had happened to her." *Id.* at 22. The trial court found Gilliard's alibi defense to be unbelievable compared to the other evidence from trial. *Id.* at 21–22.

Gilliard's argument is unpersuasive that the trial court's reasoning represented an abuse of discretion. We add only that M.J.'s inability at trial to remember certain aspects of what Gilliard did to her does not contradict her prior statements such that the trial court's decision to credit M.J. should have shocked the trial court's conscience. As the trial court recognized, this was within its discretion in its role as finder of fact based on its observations at trial. *Id.* at 23. Gilliard's weight challenge fails.

Lastly, we turn to Gilliard's challenge to the discretionary aspects of his 16-to-32-year sentence. Gilliard argues that the trial court imposed an excessive sentence above the mandatory minimum 10-to-20-year term by failing to consider a long gap in his criminal record, which would have reduced his prior record score had his crimes occurred after the eighth edition of the sentencing guidelines went into effect.

- 26 -

Gilliard preserved his issue by raising it with the trial court, by filing a timely notice of appeal, by including a statement of reasons for appealing sentencing discretion in his brief, and by presenting a substantial question for review. *See Commonwealth v. Swope*, 123 A.3d 333, 339–40 (Pa. Super. 2015) (reaching the merits of a claim that a sentence was excessive as the sentencing court failed to consider mitigating factors). We thus address the merits.

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Sheller*, 961 A.2d 187, 190 (Pa. Super. 2008) (quoting *Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006)). A sentencing court is required to consider the guidelines in imposing a sentence, although it may depart from them based on permissible factors. *Id.* "The trial court must apply the Sentencing Guidelines in effect at the time of the offense when calculating the defendant's guideline sentence(s)." *Commonwealth v. Pisarchuk*, 306 A.3d 872, 880 n.7 (Pa. Super. 2023) (citing *Commonwealth v. Maneval*, 688 A.2d 1198, 1200 (Pa. Super. 1997)). If the "sentencing court sentenced within the sentencing guidelines," then this Court must affirm the sentence imposed unless "the case involves

circumstances where the application of the guidelines would be clearly unreasonable." 42 Pa.C.S. § 9781(c)(2).

Here, the trial court noted Gilliard's extended crime-free period. The court acknowledged Gilliard's argument about the lapsing provision in the eighth edition of the guidelines. Applying the seventh edition as required, the court imposed a minimum sentence at the bottom of the standard range for rape of a child (16 years to the statutory limit of 20 years) in consideration of the mitigating factors that Gilliard identified. Under these circumstances, the court's application of the seventh edition of the guidelines to impose a 16-to-32-year sentence was not clearly unreasonable, and Gilliard's sentencing challenge fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/26/2026